## NATIONAL TREASURY EMPLOYEES UNION, et al.

v.

## Constance HORNER, Director, Office of Personnel Management, et al., Appellants.

## NATIONAL TREASURY EMPLOYEES UNION, et al., Appellants,

v.

## Constance HORNER, Director, Office of Personnel Management, et al.

Nos. 87–5102, 87–5191.

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1988.

Decided Aug. 19, 1988.

John C. Hoyle, Attorney, Dept. of Justice, with whom, Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and William Kanter, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for appellants/cross-appellees.

Clinton D. Wolcott, with whom Lois G. Williams, Washington, D.C., was on the brief, for appellees/cross-appellants.

Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

**D.H. GINSBURG, Circuit Judge:**

The district court held that the Office of Personnel Management (OPM) acted arbitrarily and capriciously when, by rulemaking, it excepted a number of government jobs from the competitive civil service. The court ordered the agency to develop competitive examinations for those positions, and to return them to the competitive service, within six months. OPM appeals, claiming that its decision to except the positions was committed to its discretion by law, and is therefore not subject to judicial review. Alternatively, it argues that even if its decision in this case is reviewable, the district court erred in finding it arbitrary and capricious.

We affirm the district court's determination that OPM's action in this case is subject to judicial review. Because OPM has presented no data to support its rationale for excepting the positions, we also affirm the district court's finding that the decision was arbitrary and capricious; however, we remand the matter to the district court, with instructions that OPM be permitted to reopen the rulemaking proceeding, for a limited time, in order to marshal data to support its decision.

## I. BACKGROUND

Federal civil service employees, other than those in the Senior Executive Service, are employed in either the "competitive service," 5 U.S.C. § 2102(a)(1) (1982), or the "excepted service." *Id.* at § 2103(a). Applicants for employment in the competitive service must generally take a "competitive examination," which OPM administers. The applicants are then ranked on the appropriate civil service register on the basis of their examination scores. When an agency needs to fill a competitive service position, it must select from among the top three applicants on the register corresponding to that position. 5 C.F.R. § 332.404 (1988).

When warranted by "conditions of good administration," the President is authorized by statute to specify "necessary exceptions of positions from the competitive service." 5 U.S.C. § 3302(1). The President has in turn delegated to OPM authority to "except positions from the competitive service when it determines that appointments thereto through competitive examination are not practicable." Exec. Order No. 10,-577, 5 C.F.R. § 6.1(a) (1988), *reprinted in* 5 U.S.C.A. § 3301 note at 192 (Supp.1988). Applicants for such excepted service positions, like applicants for the competitive service, are to be selected "solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity," 5 U.S.C. § 2301(b)(1), but they are obviously not required to take a competitive examination. Rather, a variety of more flexible and informal procedures—some established by OPM and others developed by individual agencies—are used to recruit and select new employees into the excepted service.

From 1974 to 1982, the federal government used the Professional and Administrative Career Examination (PACE) to fill 118 different entry level jobs, known as Professional–Administrative Career (PAC) positions, in the competitive service. In 1979, a suit was filed challenging the PACE on the ground that it had a discriminatory impact on black and Hispanic applicants for federal employment. *See Luevano v. Campbell,* 93 F.R.D. 68 (D.D.C.1981). That litigation was settled in early 1982 by a consent decree providing that the government would phase out the PACE over no more than a three-year period.

In May of 1982, however, less than six months after the entry of the consent decree, OPM proposed, in an informal rulemaking proceeding, to drop the PACE forthwith, and to except the PAC jobs from the competitive service. 47 Fed.Reg. 20,-264 (May 11, 1982). Specifically, the jobs would be placed in the excepted service on Schedule B, which includes "[p]ositions other than those of a confidential or policy-determining character for which it is not practical to hold a competitive examination." 5 C.F.R. § 6.2 (1988). In the notice adopting the proposal as a final rule, OPM stated:

Excepting these positions from the competitive service and placing them in Schedule B is appropriate because (1) there are no alternative written tests and other merit selection procedures, other than PACE, currently available, (2) restrictions in Federal employment will result in substantially reduced external hires in many former PACE occupations, and (3) the cost of developing validated competitive examinations consistent with the consent decree would be prohibitive, especially for the occupations where relatively few hires are expected.

47 Fed.Reg. 38,257 (Aug. 31, 1982). OPM also noted that converting the positions from competitive to excepted status was "intended and expected to enhance Federal employment opportunities for individuals who belong to minority groups." *Id.* at 38,258.

Since use of the PACE was discontinued, the vast majority of PAC vacancies have been filled through promotions, reassignments, and transfers; such internal placements were not subject to examination before, and were thus not affected by, the change in hiring procedures. Moreover, OPM has developed job-specific competitive examinations for 16 of the PAC jobs in which the largest number of entry-level employees are hired. Consequently, more than half of such external hiring as is done to fill PAC jobs is still done pursuant to a competitive examination. There are, however, a substantial number of new PAC employees who are hired into the excepted, rather than the competitive, service solely as a result of the 1982 rulemaking.

In 1984, NTEU and four named customs inspectors filed this suit, claiming that the conversion of PAC positions from competitive to Schedule B status violated civil service statutes requiring competitive hiring, and was arbitrary and capricious in violation of the Administrative Procedure Act (APA). Plaintiffs argued that, although Schedule B employees receive the same salaries and benefits as their counterparts in the competitive service, excepted service employees are disadvantaged in three specific ways: (1) they do not have the right to appeal adverse employment decisions to the Merit Systems Protection Board (MSPB); (2) when applying for competitive service positions, they get no preference for their time in the government's employ, but must compete on equal footing with members of the general public;[1] and (3) they have different tenure rights in the event of a Reduction-in-Force (RIF).[2]

In October, 1986, the district court held that plaintiffs did not have standing to bring this suit, noting that NTEU lacked standing to sue in its own right, and that because a competitive examination had recently been developed for customs inspectors, the named plaintiffs had already been converted to the competitive service. Nevertheless, the court allowed NTEU to file an amended complaint, naming as plaintiffs two Food Program Specialists employed by the Food and Nutrition Service of the Department of Agriculture in positions that had been excepted from the competitive service by the rule under challenge. 659 F.Supp. 8.

The parties then filed cross-motions for summary judgment, and the district court gave judgment for the plaintiffs. In its opinion, the court first rejected OPM's claim that its decision to except the various positions from the competitive service was not subject to judicial review. Citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the court noted that the exception from judicial review for agency action "committed to agency discretion" is very narrow; furthermore, it said, the structure and purpose of the civil service statutes

---

1. This disadvantage, however, was in part eliminated on May 11, 1987, when President Reagan provided that a qualified employee in the Schedule B excepted service "may be converted noncompetitively to a career or career-conditional appointment" in appropriate cases. Exec. Order No. 12,596, *reprinted in* 5 U.S.C.A. § 3301 note at 201 (Supp.1988).

2. It is difficult to know whether this difference is truly a disadvantage. According to OPM, in a RIF, excepted service employees may not "bump" competitive service employees, but neither may competitive service employees bump them.

indicate that "Congress intended appointment to the civil service through competitive examination to be the norm, and that placement of positions in the excepted service is ... to be undertaken only upon a finding of necessity." "Viewed against this backdrop," which it canvassed in some detail, the court concluded that "OPM's discretion to except positions [from the competitive service] is not so broad as to render its exercise unreviewable." 654 F.Supp. 1159.

The district court then addressed the claim that OPM's decision was arbitrary and capricious:

> At bottom, the underlying justification for [OPM's] decision to except the jobs in question from the competitive service is cost. The expense of developing and validating alternatives to the PACE, [OPM claims], was prohibitive and unwarranted in view of the reduction in hiring [it] anticipated ... [but OPM] offered nothing in the way of concrete proof ... in support of that claim, either at the time of the decision or during this litigation. Indeed ... [OPM has come] forward with no figures indicating what the cost of alternative tests would be, nor any other evidence demonstrating that [it] undertook any sort of cost-benefit analysis.

Accordingly, the court found that OPM had failed to give a satisfactory explanation for its decision, and therefore, that its action had been arbitrary and capricious.

Turning to the relief sought by plaintiffs, the court found that, although their claims for retroactive relief, including back pay, were foreclosed by *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), they were "clearly entitled to the declaratory and injunctive relief they seek." The court therefore ordered OPM, within six months, to "implement a fair, open and competitive examination, or examinations, to govern appointment to PAC positions currently governed by Schedule B," and to "place such positions in the competitive service." Upon motion, however, the district court stayed its decision pending appeal, because "this case involves a substantial and novel legal question," and

"in order not to deprive the appellate court of an opportunity to pass on the issue."

## II. ANALYSIS

OPM argues vigorously, as it did before the district court, that its decision to except certain PAC positions from the competitive service was committed to its discretion by law, and hence, is not judicially reviewable. It notes that under 5 U.S.C. § 3302(1), it has authority to make "necessary exceptions from the competitive service" when "conditions of good administration warrant." These statutory terms, it contends, are so vague that they do not provide the court with "meaningful standard[s] against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). As with the nonenforcement decision that the Supreme Court found to be unreviewable in *Heckler v. Chaney*, it also argues that the Executive is better equipped than are the courts to balance the competing considerations that bear on the decision to make exceptions from the competitive service.

In recognition of these factors, according to OPM, "the courts have generally held that civil service classification decisions and other agency personnel decisions are not judicially reviewable unless judicial review is provided by statute." Although it recognizes that all of the cases it cites in support of this proposition have involved individual—and, we would add, often quite minor—personnel decisions, where the employer's discretion is necessarily broad, it contends that the reasoning of those opinions applies equally to this case. OPM also argues that the "pragmatic factors" this court has considered in determining whether an action is committed to agency discretion disfavor judicial review in this instance.

On the merits, in response to the district court's criticism that it failed to support its claim of undue expense with any evidence, OPM argues that the courts should simply defer to its "expert opinion" on such matters. Finally, with respect to relief, it contends that if it failed adequately to explain

its decision, then the district court, rather than ordering "extensive changes in the operation of the civil service," should have "remand[ed] the case to OPM for the further submission of such cost data."

## A. *Reviewability*

■ The APA provides that any person "adversely affected or aggrieved" by a "final agency action for which there is no other adequate remedy in a court" is generally entitled to "judicial review thereof." 5 U.S.C. §§ 702, 704 (1982). The two exceptions to the general rule of reviewability are: (1) where "statutes preclude judicial review," and (2) where "agency action is committed to agency discretion by law." *Id.* at § 701(a). OPM claims that its action in this case falls within the latter of these two exceptions.

The Supreme Court first discussed this provision in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In that case, it noted that section 701(a)(2) "is a very narrow exception.... The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* at 410, 91 S.Ct. at 821 (footnote omitted) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). When it returned to the provision in *Heckler v. Chaney,* the Court repeated the above-quoted passage from its *Overton Park* decision, and restated its conclusion, saying that the "committed to agency discretion" exception applies where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830, 105 S.Ct. at 1655.

In this case, as the district court found, several provisions of title 5 of the U.S. Code, viewed together, provide a meaningful—not a rigorous, but neither a meaningless—standard against which to judge OPM's decision to convert the PAC positions from competitive to excepted status. Section 2102(a)(1)(A) defines the competitive service as "*all* civil service positions in the executive branch, except ... positions which are specifically excepted...." (Emphasis added.) Section 3304(a)(1) authorizes the President, and thus, by delegation, OPM, to prescribe rules "which shall provide, as nearly as conditions of good administration warrant, for ... open, competitive examinations for testing applicants for appointment in the competitive service...." And in section 3302, which authorizes OPM to prescribe rules governing the competitive service, Congress has stated that "[t]he rules shall provide, as nearly as conditions of good administration warrant, for ... necessary exceptions of positions from the competitive service." These provisions make it clear, as the district court observed, that "competitive service [is] the norm rather than the exception"; OPM is to depart from the norm only when "necessary" for "conditions of good administration." Therefore, the discretion Congress gave to OPM is not unfettered. If Congress is not indifferent to the choices an agency makes, within a sphere of action delegated to it, and does not reserve oversight exclusively to itself by precluding judicial review, then we presume the legislature expected the courts to review those choices with a degree of scrutiny calibrated to the issues involved.

Thus, OPM simply misses the mark with its argument that because "the Executive Branch has very broad discretion in this area," decisions involving the administration of the civil service "are not judicially reviewable unless judicial review is provided by statute." No one doubts that OPM must have "very broad discretion" in the administration of the civil service. But even very broad discretion is not the same as unreviewable discretion. Nor is OPM right to suggest that judicial review in this situation inevitably means that the court, rather than the agency, will decide whether an exception from the civil service is "necessary" for "conditions of good administration." We claim neither the right nor the expertise to administer the civil service in any small regard; on the contrary, we readily acknowledge that courts are in no position to decide on their own what is necessary to the good administration of

that service. *See Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Courts are, however, competent to determine whether an agency has exercised its discretion—broad though it be—in a manner arbitrary and capricious. That is our only responsibility in this case.

Noting the similarities between its decision in this case and agency nonenforcement decisions, which the Supreme Court found to be presumptively unreviewable in *Heckler v. Chaney,* OPM urges us to "afford a presumption against judicial review to [its] decisions regarding civil service personnel, when such decisions are made pursuant to authority granted to the Executive branch by Congress." In *Heckler v. Chaney,* the Court listed several reasons why agency decisions not to enforce are generally unsuitable for judicial review. One reason, the Court noted, is that "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and therefore must allocate its limited enforcement resources based on "a complicated balancing of a number of factors which are peculiarly within its expertise." 470 U.S. at 831, 105 S.Ct. at 1655. Likewise, urges OPM, abolition of the PACE confronted it with the prospect of developing more than 100 competitive examinations. It claims that because it did not have the resources to produce them all, it had to choose among them based on a balancing of factors "peculiarly within its expertise." Therefore, it argues, a presumption of unreviewability should attach to its decision in this case.

As we recently observed in *American Horse Protection Ass'n, Inc. v. Lyng,* 812 F.2d 1 (D.C.Cir.1987), however, the Court in *Heckler v. Chaney* relied upon several other characteristics of nonenforcement decisions in arriving at its negative presumption. The FDA's refusal to institute a civil enforcement proceeding in *Heckler v. Chaney* was very similar to a prosecutor's decision not to prosecute, which has traditionally been insulated from any judicial scrutiny. 470 U.S. at 832, 105 S.Ct. at 1656. Executive control over the civil service, on the other hand, while traditionally very broad, has long been subject to some de-

gree of judicial supervision. Moreover, as we recognized in *American Horse Protection,* "both prosecutors and agencies constantly make decisions not to take enforcement steps; such decisions thus are numerous." 812 F.2d at 4. OPM's decision to develop some but not other competitive examinations, in contrast, is a major policy decision, quite different from day-to-day agency nonenforcement decisions, or in its own context, from day-to-day personnel management decisions.

There is also an important procedural distinction between nonenforcement decisions and the agency action involved in this case. When Congress created OPM in 1978, it specifically required that the agency adhere to the notice and comment procedures of the APA when promulgating rules. *See* 5 U.S.C. § 1103(b) (1982). OPM was therefore required to give notice of its proposed action, and in making that action final, to publish a "concise general statement of [its] basis and purpose." *Id.* at § 553(c). This procedure provides a focal point for judicial review—quite unlike the internal agency decisionmaking that precedes decisions not to seek enforcement. In this case, OPM proposed a distinct course of action, received public comments thereon, presumably analyzed those comments, and published a decision attempting to justify its final rule in terms of policies and facts rooted, respectively, in applicable law and the rulemaking record. To ask whether the agency has adequately justified its choice in rulemaking as required by statute is a quintessentially judicial function; it is the very antipode of requiring a prosecutor, who is under no such statutory obligation, to account for each of his innumerable decisions to indict one person but not another. This is not to say that anything an agency does by way of informal rulemaking per the APA is necessarily subject to judicial review. Rather, the point is that such a proceeding, unless it is directed to enforcement policy, will not ordinarily be exempt from judicial review, on the ground offered in *Heckler v. Chaney,* for compliance with APA procedures. For these reasons, we find that the APA presumption of

reviewability, rather than *Heckler v. Chaney's* presumption of unreviewability, is the more appropriate starting point in this case.

OPM also argues that the several "pragmatic factors" this court considers in determining whether an agency action is committed to agency discretion, *see Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043–44 (D.C.Cir.1979) (*NRDC*), weigh against judicial review in this case. In *NRDC*, Judge McGowan set forth three factors that are "particularly important" in considering whether judicial review should be available: "the need for judicial supervision to safeguard the interests of the plaintiffs; the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and the appropriateness of the issues raised for judicial review." *Id.* at 1044. After reviewing these factors, he said, the court must "inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review." *Id.*

These factors are clearly insufficient in this case to overcome the presumption in favor of reviewability. As to the first of them, OPM argues that the plaintiffs are not substantially harmed by serving in the excepted instead of the competitive service because their wages and benefits are no less as a result. Still, as excepted service employees, their tenure rights appear to be diminished, and their access to the MSPB is cut off. Although these are less palpable harms than a loss of wages or benefits, they are experienced by each of the several thousand new PAC employees hired every year; in the aggregate, therefore, the interests represented by NTEU are not insubstantial, and OPM points to no reason to believe that they are likely to be safeguarded by other means, absent judicial review.

Regarding, second, the impact of judicial review on the agency's ability to carry out its statutory role, OPM claims that it would be forced to make decisions based not only upon the needs of "good administration,"

but also with an eye to avoiding future litigation. Obviously, resources drawn off by litigation are not available for pursuit of the agency's statutory mission. This consideration is admittedly compelling in the context of government employment, for there are literally hundreds of thousands of employment decisions made every year; subjecting each of them to the possibility of judicial review would be utterly impractical, both for the agencies and for the courts. For just this reason, the courts have generally held that minor personnel actions are not reviewable in court, particularly since the enactment of the Civil Service Reform Act of 1978. *See U.S. v. Fausto,* —— U.S. ——, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *see also Carducci v. Regan,* 714 F.2d 171 (D.C.Cir.1983) (minor personnel decisions, such as reassignment without reduction in pay or grade, committed by law to agency discretion). For the same reason, judicial review of a decision to except a particular position from the competitive service might be inappropriate. In this case, however, we are confronted with a major policy decision, established through notice and comment rulemaking, that affects more than one hundred civil service positions and thousands of government employees. We cannot see that subjecting a decision of this magnitude to judicial review is likely to sweep into court along with it so many decisions, or any decisions of lesser import, as to have an adverse impact on OPM's ability to perform its statutory duties.

As for the third factor, the appropriateness of the issues for judicial review, OPM argues that its decision not to develop a competitive examination for certain positions rested upon considerations such as "the nature of the position, the number of hires expected for the position, the cost of developing a competitive examination for the position, its own budgetary needs, and other technical and policy issues." Because these are matters peculiarly within its expertise, OPM claims, the issues in this case are inappropriate for judicial review. We agree with the premise: these are matters well within the expertise of OPM, and well without our own. The inference OPM

draws from that premise, however, misapprehends the issue before us. As we describe more fully below, the issue is most assuredly not whether the exception from the competitive service was necessary for reasons of good administration, but whether it was arbitrary and capricious for OPM to make that decision on the basis of the rulemaking record before it.

Because we find that judicial review of this issue is appropriate, we turn our attention to the substance of OPM's action.

B. *The Agency Action*

■ Our review is governed by section 706(2)(A) of the APA, which permits us to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." We are mindful, of course, that "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). On the contrary, this standard is " 'highly deferential' and presumes the validity of agency action." *Motor Vehicles Manufacturers Ass'n v. Ruckelshaus*, 719 F.2d 1159, 1164 (D.C.Cir.1983). Nevertheless, the reviewing court must satisfy itself that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Stated most simply, our task is to determine "whether the agency's decisionmaking was 'reasoned,'" *American Horse Protection*, 812 F.2d at 5, *i.e.*, whether it considered the relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record.

■ At the time it announced its decision to place the PAC positions into the excepted service, and again before the district court, OPM reasoned as follows: (1) It was obligated under the *Luevano* consent decree to discontinue the PACE, and no other competitive examination was available to replace it; (2) restrictions in federal employment were expected to result in "substantially reduced external hires" into many PAC positions; and (3) the cost of developing and validating new competitive examinations would be prohibitive and unwarranted in view of the number of PAC positions that would have to be filled by external hiring. 47 Fed.Reg. 38,257 (1982).

With respect to the first premise, NTEU argues that, under the *Luevano* consent decree, OPM was obligated not merely to drop the PACE but to develop alternative competitive examinations to replace it; therefore, it is urged, OPM may not rely on the unavailability of other examinations as a basis for converting the PAC positions to the excepted service—especially in light of its decision to discontinue the PACE more than two years before it was required to do so. We note, however, as did the district court, that the government's compliance with the consent decree is not properly before us in this case. We are reviewing a rulemaking decision, not an action to enforce a decree entered in other litigation or to impose a sanction for contempt of court. We need not decide whether the decree mandated the development of new examinations, or whether it required OPM to continue using the PACE until there were new examinations to replace it, as NTEU suggests and OPM disputes. Putting the *Luevano* decree aside, therefore, we can hardly say that OPM's decision to abandon sooner rather than later, a competitive examination that was alleged to be racially discriminatory was arbitrary and capricious.

With respect to the second and third links in OPM's chain of reasoning, NTEU objects that "OPM may not use cost as an overarching consideration, when that rationale is totally unrelated to the requirements of the statute." In other words, it maintains that OPM's authority to make exceptions from the competitive service when "necessary" for "conditions of good

administration" does not permit the agency to take cost into account. Rather, it claims, there must be something in the nature of the position that makes competitive tests impractical.

Congress expressly provided that OPM should consider "conditions of good administration" in deciding whether exceptions from the competitive service are "necessary"; and OPM is directed to make such exceptions when it is "not practicable" to administer competitive exams. It can hardly be said that it is "practicable," much less consistent with "good administration," to spend money without limitation in order to produce something that will provide a relatively modest benefit to either the quality of the federal work force or to a relatively small number of individuals. NTEU's "damn the cost" approach is far too broad to fit within the concept of "good administration"; OPM could reasonably take cost into account.

While OPM asserts that it considered costs in making its decision, "[s]tating that a factor was considered ... is not a substitute for considering it." *Getty v. Federal Savings and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir.1986). OPM did not have any evidence, so far as the record reveals, of how much it would cost to develop the necessary examinations, or of how many job openings it would need to fill through external PAC hiring, nor, hence, of the development cost per hire. Unable to point us to any data of the sort it would have considered if it had considered cost in any meaningful way, OPM urges us to defer to its "expert judgment regarding the cost of developing new examinations." There is no indication in the record, however, that OPM ever made an expert judgment about what those costs would be. As the district court noted, "despite plaintiffs' challenge to their cost justification as a bald and unsubstantiated claim, defendants have come forward with no figures indicating what the cost of alternative tests would

be, nor any other evidence demonstrating that they undertook any sort of cost-benefit analysis." Accordingly, on the record before us, we simply do not know whether OPM "examine[d] the relevant data" and made "a rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866. We are therefore constrained to find that OPM's action in this case was arbitrary and capricious.

## III. REMEDY

Having found an agency's action to be arbitrary and capricious, we would normally set it aside and order a return to the *status quo ante*. *See, e.g., International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 828 (D.C.Cir.1983). Here, however, such an order is simply not practical, insofar as it would require a return to the PACE—a result not sought by any party to this case, and one that would clearly frustrate the purpose of the *Luevano* consent decree.

Neither can we, without regard for the statutory scheme established by Congress, simply order that OPM convert the Schedule B positions back into the competitive service. Although OPM has authority, under certain limited circumstances, to make appointments to the competitive service without using a competitive examination, *see* 5 U.S.C. §§ 3302(2), 3304(b), a court-ordered return to the competitive service, without competitive examinations, would clearly be inappropriate; and NTEU has never even suggested the contrary. As we emphasized in determining that this case was amenable to judicial review, Congress clearly intended that competitive service employees be selected on the basis of competitive examinations wherever practical. It would therefore be anomalous for us to order that these positions be restored to the competitive service when no acceptable competitive examination is available.[3]

---

**3.** Upon a motion made in the *Luevano* litigation, the district court has recently determined that OPM's "use of Schedule B hiring authority is not an 'alternative examining procedure' within the meaning of the Consent Decree." *Lueva-*

*no v. Horner*, No. 79–0271, slip op. at 14 (D.D.C. June 27, 1988). Based on that finding, the district court issued an injunction requiring OPM to convert all Schedule B appointees to competitive service status, but again stayed the effect of

■ Confronted with this unusual situation, the district court ordered OPM to develop the necessary competitive examinations within six months, and at the end of that period, to convert the Schedule B positions back into the competitive service. Under the circumstances of this case, however, we believe that such an order was also inappropriate, and an unnecessary invasion of the province of the agency. The district court correctly faulted OPM for making a decision without having an adequate factual basis for it. Yet the court, with absolutely no data on the cost of developing and validating competitive examinations, and with no competence to administer the civil service, ordered OPM to produce examinations for over one hundred positions, and to do so within six months. From the record before us, it is impossible to know whether OPM, even if it devoted all its resources to the task, could accomplish such a feat; or whether incurring the cost per hire of developing the necessary examinations would be consistent with "good administration." While OPM is responsible for this gap in the record, its failure to document its conclusion in rulemaking should not lead a court so quickly to impose unknown costs upon the public fisc.

The further alternatives open to the court, in principle, were to develop the missing cost data itself or to permit the agency to do the job it should have done the first time. OPM observes that the Supreme Court, in other circumstances, has said that if an agency decision is reversed because it was not based on an adequate factual record, the reviewing court should normally remand the case to the agency for further development of the record. Most recently, in *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985), the Court stated:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*See also Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (per curiam); *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). To be sure, the Court suggested that under "rare circumstances" it might be appropriate for the court to conduct its own inquiry, reach its own conclusion, and order more intrusive relief. Neither party suggests that such circumstances obtain in this case, however. Moreover, we see no reason to doubt either that the agency will, given the opportunity, undertake to correct the factual deficiency in the rulemaking record, or that it is better able to integrate facts found with policies preferred in that proceeding, in the first instance, than it would be in an adversarial hearing before the district court.

Nonetheless, an unconditional remand of the rulemaking effort to the agency would not be responsive to the possibility that OPM will not ultimately be able to justify its original decision. In each of the Supreme Court cases cited above, a simple remand to the agency, and a return to the *status quo ante* while the agency developed an adequate record, was an appropriate remedy because setting aside the agency action during the pendency of the further proceeding on remand would not be unduly prejudicial to the other parties. In this case, however, as we have already noted, we cannot return to the *status quo ante;* not would we, even if asked, prohibit the government from continuing to hire new employees until OPM has either supported its decision or changed it. Therefore, it is essential that OPM be allowed to

---

its injunction pending issuance of our decision in this case. *Id.* We express no opinion in this

case, of course, upon the interpretation of the consent decree entered in that case.

continue using Schedule B, but only for a limited time, while it reopens the rulemaking proceeding to develop adequate data upon which to base a decision. *Cf. Independent U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 855 (D.C.Cir.1987).

Because we are not in the best position to determine the shortest reasonable timetable for that task, we remand the case for district court to establish, in consultation with the parties, an expedited schedule for further rulemaking proceedings consistent with this opinion. If OPM adheres to its decision based upon cost, but still fails to show that it considered cost to even the minimally meaningful degree required to command judicial deference to its administrative judgment, then the district court will have to fashion appropriate further relief.[4]

### IV. Conclusion

Because we find that there is law to apply in this case, we affirm the district court's determination that OPM's decision to except certain PAC positions from the competitive service is subject to judicial review; and because OPM has not presented *any* data to support its decision, we affirm the district court's finding that the decision was arbitrary and capricious. Under the unique circumstances of this case, however, we will allow OPM to continue its PAC hiring under Schedule B while it reopens the rulemaking record, for a limited time to be determined by the district court, in order to develop the facts upon which to base a final decision.

*So Ordered.*

**4.** NTEU originally filed a cross-appeal of the district court's determination that plaintiffs are not entitled to retroactive promotions and back pay, but "in order to avoid any possible question as to this Court's jurisdiction," it has since withdrawn its request for retrospective relief. At the same time, it has requested that we vacate the district court's decision denying such relief, in order "to avoid any possible *res judicata* effect should some individual file a future claim for damages." Having been withdrawn, however, the issue is not properly before us, and we decline to vacate the portion of the district court's decision that deals with it. The preclusive effect of the district court's decision in this regard is better addressed where, when, and if it is ever raised in subsequent litigation.