NATIONAL TREASURY EMPLOYEES
UNION, et al., Appellants,

v.

Ricki HELFER, Chair, Federal Deposit
Insurance Corporation, et al.,
Appellees.

No. 94–5035.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1995.

Decided April 21, 1995.

Timothy B. Hannapel, Washington, DC, argued the cause, for appellants. With him on the briefs were Gregory O'Duden, Elaine D. Kaplan, and Barbara A. Atkin, Washington, DC.

Roderick L. Thomas, Asst. U.S. Atty., Washington, DC, argued the cause, for appellees. With him on the briefs were Eric H. Holder, Jr., U.S. Atty., R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., and Thomas A. Schulz, Robert G. Clark, and Gregory F. Taylor, Attys., F.D.I.C. John D. Bates, Edith S. Marshall, and David B. Orbuch, Asst. U.S. Attys., Washington, DC, entered their appearances.

Before: WALD, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Appellants National Treasury Employees Union and two of its members ("NTEU") appeal from the grant of summary judgment upholding Office of Personnel Management ("OPM") regulations allowing the Federal Deposit Insurance Corporation ("FDIC") to bypass the competitive service hiring process for certain employees in its Division of Liquidation. NTEU challenged the regulations under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as arbitrary, capricious, and contrary to the civil service laws, but the district court concluded that OPM had considered the appropriate factors, addressed relevant policy considerations, and acted "consistent with the evidence" in approving the FDIC's hiring authority. *National Treasury Employees Union v. Hove*, 840 F.Supp. 165, 170–71 (D.D.C.1994). NTEU appeals on the ground that OPM had no factual basis for extending the FDIC's temporary hiring authority during the 1980s because changing circumstances in the banking industry made it practicable to examine potential employees for liquidator positions. NTEU also contends that the district court erred in refusing to consider the legality of 1993 revisions to the OPM regulations, and it appeals the denial of its motion to amend the complaint to include a challenge to the 1993 regulations. Finding these contentions unpersuasive, we affirm.

I.

All civil service employees in the executive branch of the federal government, other than those in the Senior Executive Service, are either in the "competitive service" or the "excepted service." 5 U.S.C. §§ 2102(a)(1), 2103(a); *see generally National Treasury Employees Union v. Horner*, 854 F.2d 490, 492 (D.C.Cir.1988). Competitive service employees, who are hired primarily on the basis of their score on a "competitive examination,"

receive a number of benefits not enjoyed by those in the excepted service. *See Allen v. Heckler*, 780 F.2d 64, 65 (D.C.Cir.1985). Of significance here, excepted service employees do not have the same rights as competitive service employees to have their seniority considered when they apply for competitive positions and to "bump" employees with less seniority in the event of a reduction in force. *See* 5 C.F.R. §§ 351.501–351.502 (1994).

Congress authorized the President, when warranted by "conditions of good administration," to make "necessary exceptions of positions from the competitive service" within the executive branch. 5 U.S.C. § 3302. The President delegated authority to OPM to "except positions from the competitive service when it determines that appointments thereto through competitive examinations are not practicable." Executive Order No. 10,-577, 5 C.F.R. § 6.1(a) (1994). OPM thereafter divided excepted service positions into three categories: Schedules A, B, and C. 5 C.F.R. § 6.2. Pursuant to its Schedule A authority, which allows exception of "positions other than those of a confidential or policy-determining character for which it is not practicable to examine," 5 C.F.R. § 6.2, OPM adopted a regulation allowing the FDIC to hire certain employees to work on bank liquidations without complying with the ordinary civil service requirements. 5 C.F.R. § 213.3133. OPM first granted this authority in 1938 and renewed or amended it in 1954, 1982, 1985, 1989, and 1993.

Initially, the FDIC used its Schedule A hiring authority primarily to engage former employees of a failed bank to work on that bank's liquidation. With the advent of the banking crisis of the 1980s, however, the FDIC began to coordinate bank liquidations through regional service centers, from which a cadre of permanent competitive service employees worked alongside temporary Liquidation Grade employees on bank liquidations. Although the FDIC generally hired the Liquidation Grade employees in response to a single bank closing, it often extended their terms as new bank closings created the immediate need for further liquidation assistance. In 1985, OPM amended the FDIC's Schedule A authority to allow it to hire new temporary employees for a period of five years after a bank closing and to extend their employment on an annual basis as needed. At the same time, OPM noted that "the state of the banking community will probably stabilize at some point. Then, the conditions justifying Schedule A appointments will no longer exist." In 1989, OPM again revised the regulation to reflect the FDIC's new responsibilities in savings and loan liquidations. 5 C.F.R. § 213.3133(a) (1989). When NTEU filed suit, the regulation excepted from competitive service:

> [a]ll Liquidation Graded, temporary field positions concerned with the work of liquidating the assets of closed banks or savings and loan institutions, of liquidating loans to banks or savings and loan institutions, or of paying the depositors of closed insured banks or savings and loan institutions. New appointments may be made under this authority only during the 5–year period following a bank or savings and loan institution closing and/or establishment of a consolidated liquidation site.

*Id.*

Toward the end of the 1980s, the number of bank failures handled by the FDIC steadily declined. As a result, the FDIC planned a massive reorganization and reduction of its liquidation workforce, under which the FDIC will consolidate its operations into five regional service centers staffed almost exclusively with competitive service employees. On December 2, 1993, OPM largely eliminated the FDIC's future Schedule A authority for temporary Liquidation Grade employees. Beginning in January, 1994, the FDIC could no longer make new Schedule A appointments under § 213.3133(a), but could retain current Liquidation Grade employees under their excepted status through June 1, 1996. Prospectively, the FDIC could hire temporary excepted Schedule A employees only within 60 days of a bank closing and could retain them for no more than two years. *See* 59 Fed.Reg. 10023, 10024 (March 2, 1994).

In the complaint, which was filed before the 1993 modifications to the FDIC's Schedule A authority, NTEU alleged that competitive examinations for the Liquidation Grade positions were not impracticable and there-

fore that the regulations extending FDIC's Schedule A authority were arbitrary, capricious, and contrary to the civil service law in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Furthermore, NTEU sought an order for the FDIC to convert all NTEU members appointed to Liquidation Grade positions to non-temporary, competitive positions. In response to the FDIC's and OPM's motion for summary judgment, the district court ruled that the record supported OPM's extension of the FDIC's Schedule A authority through the 1989 modifications on the ground that a competitive examination was impracticable. *National Treasury Employees Union v. Hove*, 840 F.Supp. at 170–71. The court noted that "plaintiffs do not appear to be challenging the OPM's December 2, 1993, action as arbitrary and capricious or otherwise contrary to law," and indicated that if NTEU wished to assert such a challenge, it could file a separate complaint. *Id.* at 168 & n. 6.

On the same day that the district court granted summary judgment, NTEU moved to amend the complaint to encompass the 1993 amendments. In its motion, NTEU argued that to the extent the 1993 regulations revoke the FDIC's long-term Schedule A hiring authority, the 1993 regulations confirm that the use of the challenged hiring authority throughout the 1980s was unlawful, and to the extent that OPM refused to convert current Liquidation Grade positions to competitive service positions, the 1993 regulations are arbitrary and capricious and contrary to law. The district court denied the motion to amend, concluding that the 1993 revisions did not affect the validity of the 1989 regulations. *National Treasury Employees Union v. Hove*, No. 90–2161, slip op., 1994 WL 801502 (D.D.C. Feb. 9, 1994). The court again noted that NTEU could bring an independent challenge to the 1993 regulations. *Id.* at 2.

## II.

■ Preliminarily, we reject appellees' contention that a July 1994 memorandum of understanding between NTEU and the FDIC moots the instant appeal. The memorandum of understanding, which addresses the rights of Liquidation Grade employees

during the reorganization and downsizing of the FDIC's liquidation staff, appears to assume that the FDIC's Schedule A hiring authority will continue through May 1996. Nowhere in the document does NTEU acknowledge that the hiring authority is lawful. Nor does the memorandum purport to settle the current dispute between the parties over the validity of OPM's conclusion that competitive examination was impracticable throughout the 1980s. *Cf. Douglas v. Donovan*, 704 F.2d 1276, 1278–79 (D.C.Cir.1983). Therefore, because the memorandum of understanding neither eliminates the expectation that FDIC's retention of the excepted Liquidation Grade workers will continue nor "completely and irrevocably eradicate[s] the effects of the alleged violation," *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), NTEU's appeal is not moot.

■ Regarding the legality of the Schedule A hiring authority, NTEU contends that the district court erred in granting summary judgment because OPM had no basis for concluding that it was impracticable to examine for Liquidation Grade positions. The court reviews OPM's decision to exempt employees from the competitive service under § 706(2)(A) of the Administrative Procedure Act, which provides that the court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see NTEU v. Horner*, 854 F.2d at 498. The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Nonetheless, the court must "'determine whether the agency's decision-making was reasoned,' *i.e.*, whether it considered the relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record." *NTEU v. Horner*, 854 F.2d at 498 (quoting *American Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 5 (D.C.Cir.1987)). Applying this deferential standard of review, we conclude that OPM's extension of tempo-

rary Schedule A authority to the FDIC throughout the 1980s was neither arbitrary and capricious nor otherwise contrary to the law. *See Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995) (grant of summary judgment reviewed *de novo* ).

NTEU does not quarrel with the legal standard that OPM applied, but it contends that OPM did not have an adequate factual basis for the conclusion that it was impracticable to examine competitive service employees for Liquidation Grade positions. NTEU makes three arguments: first, in the 1980s, when the FDIC's liquidation practices changed from isolated events to industry-wide phenomena and its staffing changed from bank-specific liquidation teams to regional offices with employees working on multiple liquidations, the justification for temporary Liquidation Grade positions waned and eventually ceased to exist; second, the immense growth in the number of Liquidation Grade employees during the 1980s made examinations practicable when OPM extended the FDIC's Schedule A hiring authority in 1989; and third, the 1993 regulations confirm that examination of Liquidation Grade employees was practicable during the 1980s and that OPM should have limited the FDIC's Schedule A authority to former employees of failed banks in the period immediately following a bank closure. None of these arguments persuades us that OPM's decision was arbitrary and capricious.[1]

First, the record shows that OPM recognized the changing nature of the banking industry in the 1980s and extended the FDIC's Schedule A authority because the banking crisis required the FDIC to respond to an unpredictable number of bank failures that might erupt in any region at any time. In December 1984, for example, the FDIC pointed out that the number of bank failures had accelerated at a higher than expected rate in 1983 and 1984 and declared that it could not have met its obligations to depositors without the ability to "supplement the resources of the Division of Liquidation" with temporary workers. Whereas in 1982 the FDIC had anticipated approximately 100 liquidations involving $5–40 million in assets over the next two years, as of December 1993 it found itself with more than 170 liquidations with a book value of $4.4 billion. Consequently, although the FDIC had initially planned to use a career field force to liquidate closed banks, it needed quickly to hire hundreds of additional workers to handle the burgeoning number of liquidations. OPM knew about the regionalization of the FDIC's liquidation efforts when it extended the FDIC's Schedule A authority in 1985, noting that the "FDIC has consolidated regional bank liquidations into Liquidation Regional Offices," from which "[t]emporary employees . . . work on more than one bank liquidation." Nonetheless, OPM recognized that the FDIC's liquidation offices had "fluctuating" and often "emergency hiring needs" that resulted from additional bank closings or complications from a single liquidation. Based on this record, OPM reasonably extended the FDIC's Schedule A authority in 1985 because the "urgency of initial hiring, desirability of picking up some staff from closed banks, and uncertain future employment needs" made competitive examination impracticable.

Similarly, in its 1989 request for additional Schedule A authority, the FDIC pointed out that the Schedule A authority enabled it to hire local individuals "as soon as FDIC takes custody of a closed bank" and reiterated that the urgency of initial hiring, the temporary nature of the work, and the inability to anticipate hiring needs all supported extending Schedule A authority. The FDIC also noted that its ability to hire Liquidation Grade employees had eliminated the need for "an unnecessarily large permanent staff of experienced liquidators and support personnel" in bank liquidations and had thereby enabled it to "restrain costs based on actual versus anticipated staffing needs." OPM's letter approving the FDIC's request concurred that "the necessity for providing a means to rapidly hire the personnel necessary for critical situations demanding immediate attention and action" justified the Schedule A authority. OPM therefore had ample evidence upon

---

1. Hence, we have no occasion to consider whether converting Liquidation Grade employees without administering competitive examinations is an appropriate remedy. *Compare NTEU v. Horner,* 854 F.2d at 499, *with Allen v. Heckler,* 780 F.2d at 71.

which to base its conclusion that, despite the regionalization of the FDIC's liquidation efforts, competitive examination of Liquidation Grade employees was impracticable throughout the banking crisis of the 1980s.

NTEU's second contention is no more persuasive. NTEU contends that OPM's 1989 extension of the FDIC's Schedule A hiring authority was arbitrary and capricious because the agency did not consider the escalating number of Liquidation Grade employees during the early and mid–1980s, which rose from 224 employees in 1982 to 11,102 in 1993. Nothing in the statute, the Executive Order, or OPM's regulations requires OPM to consider the number of excepted employees in deciding whether competitive examination for positions is impracticable.[2] *Cf. NTEU v. Horner*, 854 F.2d at 499. Further, the record shows that OPM was aware that the number of temporary Liquidation Grade employees had steadily grown throughout the 1980s as the banking crisis spread. In 1985, for example, OPM recognized the "massive demands" upon the FDIC's division of liquidation caused by the burgeoning number of bank failures—"42 in 1982, 48 in 1983, 79 in 1984, and 29 so far this year, with 800 banks still on the 'problem list' "—and noted that the FDIC would have to retain some excepted employees and hire others "to handle extra work generated by new bank closings." In light of the large number of bank

failures in the 1980s, the fact that OPM did not find the rising number of Liquidation Grade employees sufficient to make competitive examination practicable does not make its decision arbitrary and capricious.[3]

Third, NTEU contends that the December 1993 revisions, which sharply curtailed the FDIC's Schedule A authority, implicitly acknowledged that the FDIC could have met its hiring needs through the competitive service in the 1980s. According to NTEU, the 1993 regulations, which give the FDIC only 60 days to hire temporary employees after a bank closure and limit such temporary employment to two years, illustrate that OPM and the FDIC irrationally and arbitrarily departed from the pre–1980s scheme of excepted employment only for immediate, bank-specific needs. This argument overlooks the fundamental difference between the FDIC's hiring needs in the 1980s and its anticipated needs after 1993. As discussed, both OPM and the FDIC attributed the need for extensions of excepted employment in the 1980s to the proliferation of bank failures and the unpredictability of future hiring needs. By the late 1980s, the number of bank failures decreased to a steady, predictable flow. OPM decided to restrict the FDIC's Schedule A authority in 1993 "[b]ased upon the conditions that exist today in the banking world," *i.e.*, the decline in new bank failures and the reorganization of the FDIC's liqui-

2. Beginning in 1989, OPM's Personnel Manual required agencies seeking approval of excepted service positions to provide statistics on the anticipated number of excepted employees. *Fed. Personnel Manual* Ch. 213, Subch. 2–4a(3)(a)(iv) (1989). NTEU does not specifically challenge OPM's failure to require the FDIC to comply with this requirement, but points to the regulation as evidence that the number of excepted employees is a "relevant factor" to be considered in deciding whether competitive examination is impracticable. *See NTEU v. Horner*, 854 F.2d at 498. In the absence of any indication that OPM intends to bind itself to consideration of particular factors, however, the court has no occasion to interpret the Personnel Manual to constrain OPM's discretion in determining whether competitive examination is impracticable. *See Jackson v. Culinary School of Washington, Ltd.*, 27 F.3d 573, 585–86 (D.C.Cir.1994); *Vietnam Veterans v. Secretary of the Navy*, 843 F.2d 528, 536–38 (D.C.Cir.1988).

3. NTEU maintains that a 1982 OPM decision to convert Liquidator-at-Large positions into competitive service positions indicates that growth in the work force is a factor that OPM must consider in deciding whether competitive examination is impracticable. Although OPM did find the size of the Liquidator-at-Large workforce important to its conclusion that examination was practicable, differences between the functions of Liquidators-at-Large and Liquidation Grade employees explain OPM's treatment of the two groups. Whereas Liquidators-at-Large report directly to the FDIC's Washington office and are permanent employees specifically hired to oversee numerous bank liquidations, Liquidation Grade employees generally work on particular bank closings within a local market that they know well. Although their terms may be extended as additional bank failures create new liquidation demands, the FDIC's need for Liquidation Grade employees, unlike Liquidators-at-Large, depends on bank closing activity within their region, requires staffing "on a very short-term notice," and fluctuates in an unpredictable way.

dation procedures, which made it feasible to handle a predictable number of liquidations with a steady work force. The 1993 revisions by no means evidence an "acknowledgement" that the earlier hiring authority was illegal; instead, they reflect a response to changed circumstances, which OPM predicted as early as 1985.

In light of the unpredictable nature of bank closings, the immediacy of the FDIC's employment needs, and the inability to anticipate whether new bank closings in the area might erupt and require additional employees, OPM reasonably could conclude that a competitive service requirement was impracticable because it would hinder the FDIC's ability to liquidate banks efficiently during the banking crisis of the 1980s. Consequently, OPM's authorization and extension of Schedule A authority to the FDIC had ample support in the record and was not arbitrary and capricious, and the district court properly granted summary judgment on NTEU's Administrative Procedure Act claim.

■ Nor do we find persuasive NTEU's contention that the district court erred by failing to consider the legality of the 1993 regulations in granting summary judgment. NTEU's challenge to the 1993 regulations is limited to OPM's refusal to convert incumbent Liquidation Grade positions to competitive service positions. Contrary to NTEU's contention, this challenge is not "part and parcel" of its original complaint, which focused on the legality of OPM's conclusion that competitive examination of Liquidation Grade employees was impracticable. Instead, the dispute over the 1993 regulations raises new legal and factual questions, such as whether conversion was required by other OPM regulations and whether, assuming OPM had discretion not to convert, its decision relied on impermissible factors or was otherwise arbitrary and capricious. Because the 1993 regulations do not bear upon the claim in NTEU's initial complaint, the district court could properly conclude that the complaint did not contest the legality of the December 1993 action.

■ NTEU's alternative contention, that the district court abused its discretion in denying the motion to amend the complaint to add a direct challenge to the 1993 revisions, is also unavailing. This court's review is limited to inquiring whether the refusal to allow an amendment was "based on a valid ground." *See Gaubert v. Federal Home Loan Bank Bd.,* 863 F.2d 59, 69 (D.C.Cir. 1988); *see also* Fed.R.Civ.Proc. 15(a). Although "[l]eave to amend should ordinarily be freely granted to afford a plaintiff 'an opportunity to test his claim on the merits,' the Supreme Court has noted that when the amendments would serve no purpose, the court is on solid ground in denying a motion for leave to amend." *Gaubert,* 863 F.2d at 69 (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). Here, because the 1993 regulations do not affect the legality of OPM's decision to extend the FDIC's Schedule A authority during the banking crisis of the 1980s, the amendment would not strengthen NTEU's original claim. *Id.* To the extent NTEU sought to add new claims based on OPM's refusal to convert Liquidation Grade positions into competitive service positions, the district court did not abuse its discretion in denying the amendment, which bore "only tangential relationship" to the original claim. *Cf. Anderson v. USAir, Inc.,* 818 F.2d 49, 57 (D.C.Cir.1987). NTEU suffered no prejudice by the denial because it can file an independent challenge to the 1993 regulations. *Id.; see also United States Labor Party v. Oremus,* 619 F.2d 683, 692 (7th Cir.1980).[4]

Accordingly, because the record demonstrates that OPM was not arbitrary and capricious in extending the FDIC's Schedule A hiring authority during the banking crisis of the 1980s, and the district court did not abuse its discretion in denying the NTEU's motion to amend its complaint, we affirm the grant of summary judgment and the order denying the motion to amend.

---

**4.** Thus, we need not reach NTEU's challenge to the denial of the motion to compel production of the full administrative record underlying the 1993 modification.