**FORT SUMTER TOURS, INCORPO-RATED, Petitioner–Appellant,**

v.

**Bruce BABBITT, Secretary, United States Department of the Interior, Respondent–Appellee.**

**National Park Hospitality Association, Amicus Curiae.**

No. 94–1570.

United States Court of Appeals, Fourth Circuit.

Argued May 1, 1995.

Decided Sept. 27, 1995.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Chief Judge ERVIN and Senior Judge YOUNG joined.

## OPINION

MURNAGHAN, Circuit Judge:

Fort Sumter Tours, Inc. ("FST") provides public boat transportation in Charleston, South Carolina under a concession arrangement with the United States Secretary for the Interior ("Secretary"), pursuant to a contract between FST and the National Park Service ("NPS"). Under the contract, FST is required to pay a franchise fee to the Secretary equal to a determined percentage of FST's annual gross receipts; the contract provides for reconsideration of the franchise fee at five-year intervals. After five years had passed on FST's present contract, NPS notified FST that it wished to renegotiate the franchise fee. FST objected to the proposed fee change, but refused to engage in discussions with NPS. After an investigation, NPS

adopted a significantly increased franchise fee. When FST challenged the fee in the district court, the court affirmed NPS's decision to raise the franchise fee. FST appeals, and we affirm.

## I. *Factual Background*

The Fort Sumter National Monument ("the Monument") is located in Charleston Harbor, South Carolina. NPS, which administers the Monument for the Secretary, organizes the provision of facilities and services for the public at the Monument by entering into concession contracts with private companies. FST is one such company. FST's contract with NPS provides that FST will furnish boat transportation services to and from the Monument. The concession contract requires FST to operate two mainland docking facilities and to provide sightseeing vessels; NPS maintains the Monument and a suitable dock at the Monument.

The concession relationship between the FST and NPS began on July 13, 1961, when NPS first selected FST to operate the boating facility. The present contract, entered into on June 13, 1986 with an expiration date of December 31, 2000, is the fourth in a series of concession contracts between FST and NPS. Section 9(a) of the present contract calls for FST to pay a franchise fee to the Secretary in the amount of 4.25% of FST's annual gross receipts. Section 9(e) of the contract further authorizes reconsideration of the fee at the end of each five-year period at the request of either party to the contract. If such a request is timely made (within sixty days after the end of a five-year period), the parties may negotiate the modification; if they cannot agree, however, NPS makes a final decision as to the franchise fee modification. The contract includes a provision for the appointment of an advisory arbitration panel to make a recommendation to NPS regarding the fee adjustment. Any new fees established are retroactive to the beginning of the five-year period for which a reconsideration of fees was sought.

In a letter of June 20, 1991, the NPS Southeast Regional Director notified FST that NPS was considering renegotiating the contractual franchise fee. NPS prepared a franchise fee analysis on February 27, 1992, which concluded that a 12% franchise fee was appropriate for the five-year period starting on June 13, 1991. FST was advised of the NPS determination by letter dated March 16, 1992; the letter also indicated that NPS was willing to meet with FST to discuss the determination. FST objected to the 12% figure by a letter on March 24, 1992.

Thereafter, an FST attorney sought documents relevant to the fee determination from NPS under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. On May 15, 1992, NPS again invited FST to discuss the franchise fee modification. However, on April 14, 1993, FST advised NPS that, rather than pursuing further negotiations, it intended to ask a court to rule on NPS's authority to increase the franchise fee. FST filed a declaratory action in the United States District Court for the District of South Carolina on April 21, 1993, seeking a ruling regarding the rights and obligations of the parties under the National Park System Concessions Policy Act, 16 U.S.C. §§ 20–20g, and under the relevant concession contract. By a letter dated June 16, 1993, NPS advised FST that, because FST refused to negotiate the fee and did not wish to avail itself of the advisory arbitration provisions under the contract, NPS had performed an independent review and had determined that a fee of 12% was appropriate. The 12% fee determination became a final decision of the Secretary, and NPS requested payment of the fee amount from FST. FST's suit then became an administrative appeal of the Secretary's final decision, over which the district court had jurisdiction by virtue of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

Shortly after filing suit, FST attempted to depose several NPS employees. NPS moved for a protective order which was granted in part by a magistrate judge, and then granted in its entirety by the district court upon reconsideration. All discovery was prohibited.

After briefing and oral argument on January 5, 1994, the district court entered an order upholding NPS's decision to raise FST's franchise fee to 12% of FST's gross receipts. FST's motion for reconsideration

of the order was denied, and FST appealed. In this Court, FST claims that NPS did not have the statutory or the contractual authority to raise the franchise fee. FST also contends that NPS's notice of its intention to change the fee was inadequate under the contract, and that NPS calculated the 12% fee incorrectly.

## II. *Statutory Authority*

■ NPS claimed authority for its adjustment of FST's franchise fee under both the National Park System Concessions Policy Act ("CPA"), 16 U.S.C. §§ 20–20g, and the concession contract between FST and NPS. To calculate the exact amount of the adjusted fee, NPS further relied on Chapter 24 of the Concessions Guidelines, commonly referred to as "NPS–48," which is an agency guideline developed by NPS in 1986 that establishes a methodology for the calculation of concessioner franchise fees. FST argues that the method used by NPS to calculate the fees challenged in the instant case contravenes both the language and the purpose of the CPA. Specifically, FST claims that (1) NPS, in violation of the CPA, used the adjustment of franchise fees as a way in which to limit FST's profits; (2) while the CPA allows NPS to reconsider fees unilaterally, it does not allow NPS to adjust fees; and (3) section 9(e) of the concession contract, which provides the contractual authority for an adjustment of franchise fees, does not constitute an "appropriate provision" for the reconsideration of fees as required by the CPA. This Court reviews *de novo* the district court's interpretation of a statute. *C.G. Willis, Inc. v. The Spica,* 6 F.3d 193, 196 (4th Cir.1993) (citing *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991)).

### A. *Limitation of Profits*

■ The CPA authorizes the Secretary of the Interior to contract with private companies in order to provide services to visitors to the National Park System, *see* 16 U.S.C. § 20a; the Secretary administers the provision of these services through NPS. The Act governs the concession agreements between the Secretary and his concessioners, such as the one between NPS and FST. The CPA contains an explicit provision regarding the reconsideration of franchise fees:

> Franchise fees, however stated, shall be determined upon consideration of the probable value to the concessioner of the privileges granted by the particular contract or permit involved. Such value is the opportunity for net profit in relation to both gross receipts and capital invested. Consideration of revenue to the United States shall be subordinate to the objectives of protecting and preserving the areas and of providing adequate and appropriate services for visitors at reasonable rates. *Appropriate provisions shall be made for reconsideration of franchise fees at least every five years unless the contract is for a lesser period of time.*

*Id.* § 20b(d) (emphasis added). NPS–48, developed pursuant to the CPA, provides a specific method for calculating franchise fees:

> The appropriate franchise fee for concessioners shall be determined by first comparing the concessioner's profitability against the profitability of similar industries. The concessioner's reported statistics may be adjusted to reflect the value realized by the concessioner. Any known future changes in the financial condition of the operation should be taken into account.
>
> In order to protect the investments and efforts of the parties involved, a minimum and maximum fee shall be determined thus establishing fee limits.
>
> A fee will be determined within these limits that produces a reasonable level of profitability consistent with the risk undertaken by the concessioner.
>
> As a final test, the impact of this fee should be reviewed to ensure that it is not at a level which will interfere with the concessioner's reasonable opportunity for a profit. Additionally, it should not interfere with the concessioner's ability to charge comparable rates or impact on NPS objectives of preserving and protecting park resources....
>
> ....
>
> *The final fee determination is based on this comparison of the concessioner's re-*

*turns with similar outside industry returns.*

(emphasis added).

FST argues that NPS–48, and actions taken by NPS pursuant to NPS–48, contravene the CPA because the CPA does not allow NPS to consider profits when determining franchise fees. FST claims that the CPA grants NPS discretion over concession matters (*i.e.* details relating to FST's daily operational activity), the exercise of which has an incidental effect on profits, but does not allow NPS directly to adjust fees based on profits. According to FST, only market forces should exert direct control over a concessioner's profits.

FST contends, moreover, that NPS–48 controverts the purposes of the CPA by focussing the franchise fee determination on a comparison of a concessioner's returns with the profits of other companies in the industry. By calculating franchise fees based on such a comparison, FST claims, NPS necessarily tailors concessioner profits to the *average* profitability of other similar companies. FST argues that such a limitation of profits encourages mediocrity and discourages efficiency in the concession industry, although the CPA is designed to protect concessioner investment and encourage efficiency. *See, e.g.,* 16 U.S.C. § 20b(a) (Secretary should "assure the concessioner of adequate protection against loss of investment . . . ."); *id.* § 20e (concessioner acquires a possessory interest in structures and improvements on land administered by NPS); S.Rep. No. 765 ("Senate Report"), 89th Cong., 1st Sess. (1965) ("Section 2 emphasizes the importance of encouraging private concessioners to provide and operate such facilities as the Secretary of the Interior finds desirable for the accommodation of visitors to National Park Service areas and directs the Secretary to 'encourage and enable' such persons to do so."), *reprinted in* 1965 U.S.C.C.A.N. 3489, 3493.

We disagree with FST's characterization of the role of concessioner profits in the franchise fee determination. First, it is clear that the CPA permits the express consideration of profits. The CPA dictates that franchise fees should be based on the "probable value to the concessioner of the privileges granted by the particular contract or permit involved[,]" 16 U.S.C. § 20b(d), and defines the "probable value" as the "opportunity for *net profit* in relation to both gross receipts and capital invested." *Id.* (emphasis added). The CPA further mandates that the Secretary "exercise his authority in a manner consistent with a reasonable opportunity for the concessioner to realize *a profit* on his operation as a whole commensurate with the capital invested and the obligations assumed." *Id.* § 20b(b) (emphasis added). Thus, the CPA itself quite explicitly permits the calculation of a franchise fee in relation to the profits that can be expected by a concessioner.

Further, FST has failed to substantiate its contention that NPS–48 is designed to *limit* concessioners' profits. Contrary to FST's contention, profit limitation is not the goal of NPS–48; rather, the goal of NPS–48 is clearly to provide a framework for the reporting of financial data and for the determination of an appropriate franchise fee, and the profit of others in the industry is a valid factor for NPS to include as a consideration in the fee determination. In sum, the CPA gives NPS the authority to consider profits in calculating franchise fees, and NPS–48 provides an appropriate method under the CPA for weighing profits in its fee determination.

B. *Authority to Adjust Fees Unilaterally*

■ The contract between NPS and FST in the instant case details the procedure which a party must follow when seeking an adjustment of franchise fees. While the procedure involves the participation of both parties, in the end, it is NPS's final determination of the fee amount which governs. FST argues that although the CPA authorizes the unilateral *reconsideration* of fees by NPS, the statute does not allow NPS to *adjust* franchise fees absent agreement by both parties to the concession contract.

The CPA expressly provides for the reconsideration of a concessioner's fees: "Appropriate provisions shall be made for reconsideration of franchise fees at least every five years unless the contract is for a lesser period of time." 16 U.S.C. § 20b(d). The stat-

ute does not, however, state whether the provision for reconsideration of fees also applies to adjustment of fees. We therefore look beyond the language of the statute to determine whether NPS's interpretation of the statute, which would authorize NPS not only to reconsider, but also to adjust fees in the instant case, is a rational one. *See Adams v. Dole,* 927 F.2d 771, 774 (4th Cir.), *cert. denied,* 502 U.S. 837, 112 S.Ct. 122, 116 L.Ed.2d 90 (1991) (If the language of a statute is clear, a court must give effect to the intent of Congress as expressed in the statute; "[i]f the statute is ambiguous, however, the question then becomes one of whether the interpretation by the agency charged with its administration is a permissible one." (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984))).

H.R. 2091, the bill which ultimately became the CPA, provided that "[a]ppropriate provision *may* be made for periodic *reconsideration and adjustment* of franchise fees...." H.R. 2091, 89th Cong., 1st Sess. (1965) (emphasis added). However, the bill as eventually passed stated that "[a]ppropriate provisions *shall* be made for *reconsideration* of franchise fees at least every five years...." 16 U.S.C. § 20b(d) (emphasis added). Stewart L. Udall, then Secretary of the Interior, suggested the amendment to the bill, stating, "This amendment would bring the provisions of the bill generally in line with the executive branch policy for frequent review of fees charged." Senate Report, *reprinted in* 1965 U.S.C.C.A.N. 3489, 3498. FST claims that the sole amendment that was made to the H.R. 2091 franchise fees provision before the bill was passed was the deletion of the word "adjustment," and that the amendment demonstrates Congress' intent to preclude NPS from adjusting franchise fees under the authority granted to NPS by the statute.

However, FST ignores another amendment that was made to the bill's language: the word "may" was changed to "shall." An equally plausible reason for the deletion of the word "adjustment" is that Congress chose to make reconsideration of franchise fees mandatory as opposed to permissive (and therefore substituted "shall" for "may"), but did not wish to require adjustment of fees every five years (therefore deleting "adjustment"). In other words, although NPS should reconsider fees every five years, the fees need not actually be changed that often. "Adjustment" was thus deleted when "shall" was added. The legislative history of the CPA simply makes clear that Congress placed primary importance on the frequent reconsideration of fees; it does not necessarily indicate that Congress intended to preclude NPS's adjustment of fees.

NPS's interpretation of the CPA franchise fees provision—that it provides for adjustment as well as reconsideration of fees—is a completely logical one, and should be upheld. *See Adams,* 927 F.2d at 774 (we uphold an agency's interpretation of a statute if it is a "permissible" one); *Lewis v. Babbitt,* 998 F.2d 880, 881 (10th Cir.1993) ("We review an agency's interpretation of an ambiguous statute to determine whether it is 'rational and consistent with the statute.'" (quoting *Aulston v. United States,* 915 F.2d 584, 589 (10th Cir.1990), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991))); *see also Quang Van Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir.1989) (a court will not substitute its construction of a statute for a reasonable interpretation of the statute made by an agency (citing *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782)). In fact, NPS's interpretation is persuasive; a statutory provision calling for reconsideration of fees would be rendered meaningless if it did not include authority for the adjustment of fees as well. In addition, we do not find NPS's construction of the statute to contravene the CPA's purpose of encouraging the investment of private concessioners in the park system; a clause providing for periodic adjustment of fees, which might be raised or lowered, is not necessarily adverse to the interests of concessioners.

### C. *Appropriate Provision for Reconsideration of Fees*

■ The CPA requires that "[a]ppropriate provisions" be made for the reconsideration of fees at least every five years. *See* 16 U.S.C. § 20b(d). FST contends that, even if

the CPA provides statutory authority for NPS to adjust franchise fees, § 9(e) of FST's contract with NPS is not an "appropriate provision" for the reconsideration of fees as mandated by the CPA. Section 9(e) states in its entirety:

Within sixty (60) days after the end of each 5–year period of this contract or as otherwise specified, at the instance of either party hereto, the amount and character of the franchise fees provided for in this section may be reconsidered. Such request shall be made in writing within 60 days after the end of the applicable contract year but cannot be made before the end of such year. In the event that the Secretary and the Concessioner cannot agree upon an adjustment of the franchise fees within 120 days from the date of the request for renegotiation as made by either party, the position of the Concessioner must be reduced to writing within 30 days therefrom and submitted to the Secretary for a determination of appropriate fees, consistent with the fair value of any assigned Government Improvements and the probable value to the Concessioner of the privileges granted by this contract based upon a reasonable opportunity for a profit in relation to both gross receipts and capital invested. If desired by the Concessioner, an advisory arbitration panel will be established (one member to be selected by the Secretary, one by the Concessioner, and the third by agreement of the original two) for the purpose of recommending to the Secretary appropriate franchise fees. The Secretary and the Concessioner shall share equally the expenses of such advisory arbitration. *The written determination of the Secretary as to franchise fees shall be final and conclusive upon the parties hereto.* Any new fees established will be retroactive to the commencement of the applicable period for which notice of reconsideration is given and be effective for the remaining term of the contract unless subsequent negotiations establish yet a different franchise rate. If new rates are greater than existing rates, the Concessioner will pay all back fees due with the next regular payment. If new rates are less than the existing rate, the Concessioner

may withhold the difference between the two rates from future payments until he has recouped the overpayment. Any new franchise fees will be evidenced by an amendment to the contract unless based upon the written determination of the Secretary, in which event a copy of the determination will be attached hereto and become a part hereof as fully as if originally incorporated herein.

(emphasis added). FST objects to the contractual provision because it allows the Secretary to make a final decision concerning fees without FST's consent. FST claims that § 9(e) thereby gives NPS "an absolute right to *sabotage* the entire contract...."

However, contrary to FST's assertions, the contract does not empower NPS to exercise unfettered discretion regarding a fee adjustment. The language of the contract authorizes NPS to change fees only by complying with significant procedural constraints and safeguards. The contractual provision does not allow the changing of fees based on mere speculation, but rather mandates that fees be changed only pursuant to "a determination of appropriate fees, consistent with ... the probable value to the Concessioner of the privileges granted by this contract based upon a reasonable opportunity for a profit in relation to both gross receipts and capital invested." Section 9(e) further details a process by which each side can voice objections to fee modifications. In addition, the contract provides for advisory arbitration for the purpose of recommending appropriate fees, and NPS has devised a detailed method, embodied in NPS–48, by which to recalculate fees. Finally, under the APA, 5 U.S.C. §§ 701–706, the aggrieved concessioner may resort to the courts, where the Secretary's actions will be scrutinized to determine whether he acted arbitrarily or capriciously. *See id.* § 706. Thus, § 9(e) would not allow NPS to "sabotage" the contract, as FST fears.

■ Further, we reject FST's argument that § 9(e) of the contract violates the common law of contracts, because it allows for the modification of a contract term, *i.e.* the fee amount, without consideration from the party opposing the modification or a change

in circumstances. A fee adjustment is not technically a modification of the contract at issue; it is an action that takes place pursuant to the very terms of the contract itself, and is one that was contemplated by the parties at the time of signing the contract. Significantly, the contract does not allow random modification at the whim of NPS; as outlined above, the contract provides a check on random adjustment of fees by setting out a detailed process which must be followed before fees are changed. The contract is thus designed to force the party seeking adjustment of the fees to pursue negotiations with the other side, and to come to a fair and reasonable determination of the value of the concession.

In sum, § 9(e) is a completely appropriate contractual provision under the CPA in that it provides for modification of fees through a reasoned process, and does not vest in NPS unbridled authority; at the same time, § 9(e) guarantees that the parties will not reach a stalemate when a fee adjustment is sought. We affirm the district court's finding that NPS was acting within its statutory authority when it adjusted FST's franchise fee.

### III. *Contractual Authority*

FST also presents a challenge to NPS's authority under the contract itself to increase the franchise fee. FST claims that the contract is ambiguous because two of its terms conflict, and that the contract should therefore be construed against NPS. The district court found that under a plain reading of the contract, there was no conflict between the two contractual provisions. We review *de novo* the district court's construction of the contract. *Nehi Bottling Co., Inc. v. All–American Bottling Corp.*, 8 F.3d 157, 162 (4th Cir.1993).

Section 9(a) of the contract provides: "For the term of this contract, the Concessioner shall pay to the Secretary for the privileges granted herein as follows: .... a further sum equal to FOUR AND ONE–QUARTER PERCENT (4 1/4%) of the Concessioner's gross receipts, as herein defined, for the preceding year." FST contends that § 9(a), which provides for a 4.25% franchise fee to be paid for the term of the contract, is

in conflict with § 9(e) of the contract, which provides for the reconsideration of the franchise fee during the contract term. FST urges this Court to construe the conflict against NPS, and to hold that NPS may not change the 4.25% franchise fee specified in § 9(a).

We agree with the district court, however, that the contract is not ambiguous, because, under a plain reading of the contract, the specific fee amount in § 9(a) is meant to be subject to reconsideration as provided in § 9(e). Further, even if an ambiguity exists, we are compelled to interpret it in NPS's favor in this case. As FST itself points out, the concession contract incorporated the CPA as the law which was in effect at the time of the making of the contract. *See Northern Pac. Ry. Co. v. Wall,* 241 U.S. 87, 91, 36 S.Ct. 493, 495, 60 L.Ed. 905 (1916) ("[T]he laws in force at the time and place of the making of a contract and which affect its validity, performance and enforcement, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms."). Here, the CPA mandates that a concession contract contain a provision for reconsideration of fees at least every five years, *see* 16 U.S.C. § 20b(d), and, as we found above, reconsideration may include adjustment. Thus, any ambiguity which might be gleaned from the contractual language must be resolved in favor of the validity of § 9(e) of the contract, which carries out the statutory mandate requiring periodic reconsideration of fees. If we were to construe the contract to give effect to § 9(a) but not to § 9(e), we would be ignoring a provision of the contract that is necessary for the contract's validity under the CPA.

In addition, our interpretation of the contract, which provides for a fee of 4.25% under § 9(a) until the fee is reconsidered and adjusted under § 9(e), allows us to give effect to the contract as a whole rather than only to a single provision. *See Bruce v. Lumbermens Mut. Casualty Co.,* 222 F.2d 642, 645 (4th Cir.1955) (the general principles of contract interpretation "require that an interpretation which gives a reasonable effect to all the manifestations of intention in an agreement is preferred to an interpretation

which leaves a part of such manifestations unreasonable or of no effect. . . ."). We affirm the district court's finding that NPS had the contractual authority to adjust FST's fees in the instant case.[1]

## IV. *Notice*

■ On June 20, 1991, seven days after the June 13, 1991 expiration of the first five-year period under the concession contract, NPS wrote to FST stating that "[t]his letter is to advise you that the National Park Service is considering a renegotiation of your franchise fee." The letter directed FST to a specific paragraph of NPS–48 as well as to § 9(e) of the contract between the parties. FST argues that NPS's letter did not constitute proper notice of reconsideration of fees under § 9(e) of the contract, because the letter was not a request for a change in the amount and character of the fees.

The contract provides:

Within sixty (60) days after the end of each 5–year period of this contract or as otherwise specified, at the instance of either party hereto, the amount and character of the franchise fees provided for in this section may be reconsidered. Such request shall be made in writing within 60 days after the end of the applicable contract year but cannot be made before the end of such year.

The contractual provision specifies that notice of reconsideration, not notice of a change, must be given. Moreover, FST was given ample opportunity to object to the franchise fee determination, both at the time that it received the June 20 letter, and subsequent to NPS's determination that a 12% fee would be appropriate. The district court correctly found that the June 20 letter was sufficient to put FST on notice of NPS's intention to reconsider the franchise fee. Since the notice came within the 60–day period, it was timely. The notice was therefore unobjectionable.

## V. *Method of Calculating Fees*

■ FST raises what it believes are three errors in NPS's calculation of the 12% franchise fee in the instant case.[2] We begin our discussion of FST's challenge by reviewing the way in which NPS determined the fee adjustment. Concessioners are required by their concession contracts to submit to NPS annual financial statements that have been audited in accordance with generally accepted accounting principles. The financial reports submitted during the five most recent complete years for which reports were filed are then used by NPS as the basis for its fee determination. NPS calculates the concessioner's annual gross receipts and adjusted net income, and based on these numbers, determines a minimum and maximum franchise fee. The final franchise fee is a number between the minimum and maximum, arrived at "based on [a] comparison of the concessioner's returns with similar outside industry returns." NPS then calculates the concessioner's anticipated returns using the new franchise fee to determine the effect of the new franchise fee on the concessioner's returns. Finally, NPS looks for other facts that could have an impact on the fee, and "[a]ny known future significant changes that

---

1. We find unpersuasive FST's additional argument that § 9(a) itself is ambiguous, because the provision does not state when the probable value of the contract to the concessioner should be assessed. It is clear from the language of the contract that the value of the contract must be determined at approximately the same time as the fee reassessment takes place, *i.e.* within the time period allowed by the contract for fee reconsideration.

2. NPS contends that FST should be precluded from challenging the method by which NPS calculated the fees, because FST did not raise the issue before the agency prior to resorting to the courts. First, we note that there is no requirement of exhaustion of administrative remedies under the CPA. *See Darby v. Cisneros,* —— U.S.

——, ——, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993) (where agency action is final, there is no requirement of exhaustion of administrative remedies in a case brought under the APA, unless expressly required by statute or agency rule). In any event, FST notified NPS in a letter of March 24, 1992 that it objected to the increase of the franchise fee from 4.25% to 12%. FST also appended a copy of the petition that it planned to file in the district court, detailing the contested issues, to a letter that it sent to NPS on April 14, 1993. NPS responded on June 16, 1993 that it had "carefully reviewed [FST's] objections to our financial analysis." We find that FST sufficiently raised its objections to the fee determination before NPS.

are unique to the concessioner's operating situation should be included in the final fee determination."

 FST submitted the required financial reports to NPS in accordance with the mandates of its contract and NPS–48.[3] In making its calculations based on FST's financial data from 1986 through 1990, NPS made two major adjustments to the information before it. The first adjustment concerned the "Spirit of Charleston," a boat used by FST to provide ferry service to the Monument.[4] NPS noted that the boat was also used by FST for charter and dinner cruise operations that were unrelated to its concession business ("outside operations"). Therefore, NPS found it necessary to prorate the operating, administrative, and fixed expenses of FST related to this boat in order to isolate the financial results of FST's concession operations. FST itself made most of the proration adjustments for the Spirit of Charleston's outside operations in its financial statements, and NPS used the prorated figures submitted by FST for its preliminary analysis.

NPS, however, made an additional finding as to the Spirit of Charleston. Rather than buying the boat, the concession leased it from a limited partnership, in which FST itself was the general partner. NPS concluded that "[t]he lease is not an arms length transaction and has resulted in lower earnings than would have occurred under an outright purchase of the boat." It therefore eliminated from its calculations consideration of the lease payments made by FST for the boat, and substituted a capital expenditure of $1 million in 1986 with a depreciation over 18 years, which was the estimated life of the

boat. NPS assumed that FST had undertaken a debt of $600,000 in order to finance the purchase, with interest in the amount of $48,000 for a 10–year loan at 10%.

NPS's second adjustment to FST's financial data was made pursuant to NPS's finding that the amount of FST's officers' salaries (85% of which was attributed to the concession operation) had an adverse impact on FST's profitability. As an example, NPS pointed out that the president of FST was earning a yearly salary of approximately $200,000, although his daily activity with the concession operation was limited. In performing calculations, NPS thus chose to limit officers' salaries to 10% of FST's gross receipts, which was approximately the median in the water transportation industry according to a report published by Robert Morris Associates, 1990 Annual Statement Studies ("Morris Studies"). NPS thus reduced officers' salaries in its calculation from $304,419 to $162,742.

After making adjustments and performing the requisite calculations in order to ascertain a minimum and maximum franchise fee, and arriving at an estimated fee of 12%, NPS calculated the effect of a 12% franchise fee on FST's adjusted returns. Finally, NPS compared the FST data to the Dun & Bradstreet ("D & B") Industry Norms for the water transportation industry. NPS settled on the 12% franchise fee, which it believed would allow FST to reap profits in excess of D & B's median returns for the industry.

FST argues that there were three flaws in NPS's calculation of the franchise fee. First, FST argues that NPS's decision to ignore the terms of FST's leasing arrangement for the Spirit of Charleston was irrational and

---

3. FST argues that because NPS–48 was developed after FST entered into a contract with NPS, the guideline cannot be applied to the agreement of the parties in the instant case. However, NPS is not a law or regulation, but rather is only a guideline for use by NPS in making calculations. We find no problem with the application of NPS–48 to the agreement at hand.

4. The story behind FST's acquisition of this particular boat sheds light on the basis of the dispute in the instant case. In 1986, NPS decided that public boat transportation to the Monument should be expanded, which would require addi-

tional docking facilities and a larger vessel. In order to encourage FST to assume the added risk of investment in these facilities, the parties cancelled their existing contract (which was to run only two more years) and agreed on a new contract (the one at issue in the instant case) with a fifteen-year term. FST subsequently acquired a new vessel and established a new docking facility. According to the district court's findings, the new vessel, the Spirit of Charleston, cost FST approximately $1.4 million. The new docking facility was constructed at a cost to FST of $154,000.

unsupported by relevant data. FST also contests NPS's adjustment to the salaries of its officers, claiming that NPS's use of the Morris Studies to tailor the salaries is rational only if those studies accurately represent the industry of which FST is a part. Finally, FST argues that NPS provided no basis upon which to conclude that D & B's water transportation industry statistics are reflective of an industry that can logically be compared to FST's, because FST's situation differs from that of others in the water transportation industry due to rigid controls imposed by NPS on FST's business. FST additionally points out that even if the Morris and D & B publications contain data on industries comparable to FST's, the reports themselves may be incomplete or inaccurate.

 When reviewing informal agency action under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706. Although the arbitrary and capricious standard provides only for limited review, *National Treasury Employees Union v. Horner*, 854 F.2d 490, 498 (D.C.Cir. 1988),

> [a] reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)). It is the court's task to review the considerations on which the agency relied, and to check that the agency's decision has "some basis in the record." *Horner*, 854 F.2d at 498.

 First, we find no error in NPS's decision regarding FST's leasing arrangements for the Spirit of Charleston. We require the Secretary to articulate a rational connection between the evidence and his exercise of discretion. *See Virginia Agric. Growers Ass'n, Inc. v. Donovan*, 774 F.2d 89, 93 (4th Cir.1985). The administrative record clearly lays out the factors upon which NPS relied in adjusting FST's financial data concerning the Spirit of Charleston. NPS stated that it made its calculations based on a sale rather than a lease arrangement because it believed that the nature of the leasing transaction had lowered FST's earnings, and offered the exact figures used to calculate what the cost of the boat would have been if the boat had been purchased outright. NPS's determination is clearly supported by the facts in the record, and was not arbitrary or capricious.

 FST's two remaining challenges to NPS's fee calculation—that NPS erred in adjusting FST's officers' salaries and in comparing FST's financial data to the D & B Industry Norms—we consider together. FST first claims that it was denied an opportunity to show that both the officers' salaries and the industry standards used by NPS for comparison were inaccurate, because it was not provided with copies of the Morris Studies and D & B Norms. The studies themselves were not included in the administrative record, and the district court granted NPS's motion for a protective order, although FST had hoped to obtain the financial reports through discovery and to depose certain NPS employees who were involved in the fee determination.[5] FST claims that the district court's grant of the protective order constituted an abuse of discretion.

 Judicial review of administrative action is generally confined to the administrative record. *See Fayetteville Area Chamber of Commerce v. Volpe*, 515 F.2d 1021, 1024 (4th Cir.) (in reviewing agency action under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." (quoting *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam))),

---

5. FST also sought to obtain the relevant reports before trial, through a FOIA request. FST was not provided with the information because

"[t]hese documents are copyrighted public information that can be obtained directly from either [publishing] organization itself."

*cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975); *Lewis,* 998 F.2d at 882 ("Judicial review under these standards is generally based on the administrative record that was before the agency at the time of its decision . . . ." (citing *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir.1993))). However, although review is based on a limited record, "there may be circumstances to justify expanding the record or permitting discovery." *Public Power Council v. Johnson,* 674 F.2d 791, 793 (9th Cir.1982). We find that the district court did not abuse its discretion in finding that such circumstances did not exist in the instant case.

While it is the duty of an agency "to establish the statistical validity of the evidence before it prior to reaching conclusions based on that evidence," *St. James Hosp. v. Heckler,* 760 F.2d 1460, 1467 n. 5 (7th Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985), it is FST's burden to show that NPS's action was arbitrary and capricious, *see San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n,* 789 F.2d 26, 37 (D.C.Cir.) (party claiming that an agency's action was arbitrary and capricious bears the burden of proof), *cert. denied,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). NPS contends, and FST does not dispute, that both the Morris Studies and the D & B Norms are copyrighted publications that are available from the organizations which issue them. In addition, NPS–48, included in the administrative record, contains a "Bibliography of Industry Statistics Available for Use in the National Park Service Franchise Fee Determination," which lists the names of both publications challenged by FST, and the names of the organizations which publish them. FST cannot claim that it was unaware of which reports were relevant to the franchise fee determination in the instant case, since FST listed the exact reports in which it was interested in the revised FOIA request that it submitted to NPS on May 12, 1992. It was FST's burden to procure the Morris Studies and the D & B Norms and to attempt to

supplement the administrative record, or to show why it could not obtain the reports. It was not an abuse of discretion for the district court to deny discovery which was intended to shift the burden of producing the reports onto NPS.[6]

■ Next, FST mounts a challenge to the Morris Studies and the D & B publications themselves, claiming both that the reports provide data on companies that are not comparable to FST, and that the data contained in the reports are not accurate. An agency's use of a study that is designed for a purpose other than that for which it is used by the agency, and "which is limited and criticized by its authors on points essential to the use sought to be made of it," may be considered arbitrary and capricious action. *See Humana of Aurora, Inc. v. Heckler,* 753 F.2d 1579, 1583 (10th Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985). FST has not, however, pointed to any evidence in the record tending to prove that NPS's reliance on the studies in question constituted arbitrary and capricious action. In ruling in favor of NPS on FST's challenge to NPS's calculations, the district court stated that

> adjustments and the use of industry averages are a rational method for the government to measure profits and avoid the injustice of according lower franchise fees to concessioners with accounting methods which disguise profits. . . . [T]his court . . . finds that the procedures employed by the government analysts were rational and neither arbitrary nor capricious. It is not irrational for the NPS to utilize industry expense and profit averages as the basis to assess an individual concessioner's reasonable opportunity to make a profit.

We agree with the district court that the use of such studies by NPS in determining franchise fees is entirely appropriate. In addition, NPS–48 reflects that NPS employees are directed to use industry norms carefully when making franchise fee determinations. While FST makes bald assertions as to the

---

**6.** We note, as well, that it is unlikely that, had FST obtained the reports from the relevant organizations, NPS would have objected to the inclusion of the reports in the record before the court, since statistics from some older versions of the D & B Norms had already been included in the

administrative record as part of NPS–48. In fact, a stipulation filed with the district court on October 20, 1993 reflects that FST had supplemented the administrative record before the court on at least one occasion, with NPS's consent.

inaccuracy of the reports, it has shown neither that the industries studied in the reports were not comparable to FST's, nor that the reports themselves are inaccurate. We therefore affirm the district court's finding that NPS's use of the two publications did not constitute arbitrary or capricious action.

It was FST's burden to provide the court with evidence that NPS's actions were arbitrary or capricious. FST has produced no such evidence. We therefore affirm both the district court's finding that NPS's decision to raise FST's franchise fee to 12% was neither arbitrary nor capricious, and the district court's grant of a protective order to NPS.

## VI. *Conclusion*

We find that NPS had both the statutory and the contractual authority to raise FST's franchise fee in the instant case. Further, the notice provided to FST and the fee determination itself were unobjectionable. The decision of the district court is therefore

*AFFIRMED.*