Viktor **GJONDREKAJ**, Rafaela Gjondrekaj, Renata Gjondrekaj, Rozarta Gjondrekaj, Plaintiffs,

v.

Janet **NAPOLITANO**, in her official capacity as Secretary of the Department of Homeland Security, Alejandro Myorkaas, in his official capacity as Director of the United States Citizenship and Immigration Services, Kristi Barrows, in her official capacity as Acting Director of the Texas Service Center, United States Citizenship and Immigration Services, and Juan Osuna, in his official capacity as Director of the Executive Office for Immigration Review, United States Department of Justice, Defendants.

Case No. 3:11–cv–347–J–37JBT.

United States District Court, M.D. Florida, Jacksonville Division.

Aug. 2, 2011.

David Stoller, Law Offices of David Stoller, PA, Orlando, FL, for Plaintiffs.

David Stoller, Law Offices of David Stoller, PA, Orlando, FL, Craig Defoe, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER

ROY B. DALTON, JR., District Judge.

This cause is before the Court on the following:

1. Defendants' Dispositive Motion To Dismiss (Doc. No. 12, filed June 17, 2011); and

2. Plaintiffs' Response In Opposition To Defendants' Motion To Dismiss (Doc. No. 15, filed July 15, 2011).

Also before the Court is Defendants' Motion To Stay Case Management Requirements And To Designate This Case Track One (Doc. No. 16, filed July 26, 2011), which the Court denies as moot.

## BACKGROUND

Plaintiffs, who are Albanian citizens, bring this action to compel various federal government officials (collectively "Defendants" or the "United States") to "properly adjudicate" Plaintiffs' applications for employment authorization documents ("EAD"). Plaintiffs claim the United States wrongly denied their EAD applications, which they filed based on an application for asylum pending before the Executive Office for Immigration Review. The parties' dispute turns on the application of the applicable federal regulations.

*The EAD Application Process*

Aliens in the United States temporarily can be employed only as authorized by law. *See* 8 C.F.R. § 274a.12. Aliens who are eligible for employment apply for authorization to work by requesting an EAD from the United States Citizenship and

Immigration Services ("USCIS"), which is a component of the Department of Homeland Security. *Id.; see also* 8 C.F.R. § 274a.13. Certain asylum applicants and their family members are eligible to receive an EAD. *See* 8 C.F.R. §§ 208.7, 1208.7; *see also* 8 U.S.C. § 1158(d)(5)(A)(iii).

In the 1990s, the United States sought to separate the processing of asylum applications and the processing of EAD applications for asylum applicants. See USCIS, *Affirmative Asylum Procedures Manual,* 79–80 (rev. July 2010), http://www.uscis.gov/USCIS/Humanitarian/Refugees%20&%20Asylum/Asylum/2007_AAPM.pdf (hereinafter "Asylum Procedures Manual"). Prior to that time, federal regulations permitted aliens to apply for an EAD at the same time their asylum applications were filed. *Id.* at 79. If an asylum application was not frivolous, the EAD application was routinely approved, and an EAD was issued. *Id.* This changed when the asylum process was "reformed" in the mid–1990s.

After asylum reform was implemented, aliens could no longer apply for an EAD at the time they filed their asylum application. *Id.* Under the current regulations, an EAD application cannot be filed until after 150 days has passed after filing the application for asylum. 8 C.F.R. §§ 208.7(a)(1). If an asylum application remains unadjudicated by the USCIS or the Immigration Court after 150 days, the applicant may apply for employment authorization, which the United States must grant after 30 days unless the asylum application is denied in the interim. 8 C.F.R. §§ 208.7, 1208.7; *see also id.* §§ 274a.

12(c)(8), 274a.13(a). The time period starts when a complete asylum application has been filed, and any delay caused by the applicant is not counted. *See* 8 C.F.R. §§ 208.7, 1208.7. The regulations also prohibit the United States from issuing an EAD before 180–days have passed from the filing of the asylum application. *See* 8 C.F.R. §§ 208.7. This 180–day time period is referred to as an applicant's "asylum clock." Asylum Procedures Manual at 88–89.

If an EAD application is granted, the applicant is notified of the decision and issued an EAD by the United States. *See* 8 C.F.R. § 274a.13(b). If EAD application is denied, the applicant is notified in writing of the decision and the reason for the denial. *See id.* § 274a.13(c). Under the applicable regulations, applicants cannot administratively appeal a denial of an EAD application. *Id.*

Generally, the United State uses an automated system to compute the running of applicants' asylum clocks and record events that effect it. *See* 8 C.F.R. § 1208.7; *see also* Office of the Chief Immigration Judge, *Immigration Court Practice Manual,* 71 (Apr. 1, 2008), http://www.justice.gov/eoir/vll/OCIJPracManual/Chap%204.pdf (hereinafter "Practice Manual"); *see also* Asylum Procedures Manual at 2 (describing the Refugee Asylum Parole System), 80 (describing the Clock Query screen of the Refugee Asylum Parole System).[1] This system is used by USCIS and the Immigration Court. Asylum Procedures Manual at 2.

The ticking of the asylum clock is affected by the processing of an alien's asy-

---

1. The Court recognizes that the Asylum Procedures Manual and Practice Manual are not binding authority. They are informative, however, as to how USCIS and the Immigration Court handle the processing of these applications and how they interpret the applica-

ble statutes and federal regulations. *See, e.g., General Electric Co. v. Gilbert,* 429 U.S. 125, 140–46, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (addressing the proper deference to be afforded guidelines promulgated by the EEOC).

lum application. If the USCIS's asylum office adjudicates an asylum application, the clock stops. *Id.* at 89. USCIS may also refer an asylum application to the Immigration Court. *Id.* at 79–80. What happens during the proceedings in the Immigration Court must also be taken into account when calculating the running of an applicant's asylum clock. As such, the Immigration Court uses the United States' automated system to control the running an applicant's asylum clock. *See, e.g.,* Practice Manual at 71.

The proceedings before the Immigration Court begin by service of a notice to appear on asylum applicants. *Id.* at 64–65. An applicant's first appearance before the Immigration Court is usually a master calendar hearing. *Id.* One of the issues the Immigration Court must determine at the master calendar hearing is whether an applicant wishes the asylum clock to continue to run. *Id.* at 71. If the applicants want the clock to run, the United States handles the asylum application "expeditiously," i.e., within 180 days of the filing of their asylum application. *Id.* If not, the Immigration Judge enters a code in the United States' automated case tracking system that stops the asylum clock. The case is then scheduled in the normal course. *Id.*

*Plaintiffs' Asylum and*
*EAD Applications*

In this case, Plaintiff Viktor Gjondrekaj filed a complete asylum application with USCIS on July 7, 2008, to which the remaining Plaintiffs were dependant beneficiaries. (Doc. No. 1, ¶ 24.) USCIS denied the asylum application and referred Plain-

tiffs to the Immigration Court for removal proceedings. (*Id.,* ¶ 25.) Plaintiffs were served Notices to Appear, and subsequently attended a master calendar hearing held by the Immigration Court in Orlando, Florida, on November 19, 2008. (*Id.,* ¶ 26.) The Immigration Judge stopped Plaintiffs' asylum clock at the November 19, 2008 hearing. (Doc. No. 12–2.) 135 days had passed from the filing date of Plaintiff's asylum application.

A hearing on the merits of Plaintiffs' claims against removal was set, and subsequently held, on January 4, 2010. (*Id.,* ¶ 27.) The Immigration Court denied Plaintiffs' claims at that hearing and ordered Plaintiffs removed to Albania. (*Id.; see also* Doc. No. 5–6.) [2]

Plaintiffs appealed the Immigration Court's decision to the Board of Immigration Appeals. (*Id.,* ¶ 28.) The appeal remained pending before the Board until December 16, 2010. (Doc. No. 5–8.) On that date, the Board issued a decision affirming the Immigration Court's decision. (*Id.*) The Board remanded the case for the Immigration Court to consider Mr. Gjondrekaj and his wife's request for an adjustment of immigration status. (*Id.*)

During this process, Plaintiffs filed EAD applications. Mr. Gjondrekaj applied for an EAD on May 29, 2010. (Doc. No. 1, ¶ 16.) USCIS denied his EAD application on July 9, 2009. (*Id.*) The remaining Plaintiffs submitted EAD applications to the agency on July 13, 2010. (*Id.,* ¶¶ 17–19.) USCIS denied two of the applications on October 21, 2010, and denied the third

---

**2.** On April 25, 2011, Plaintiffs submitted to the Court certain records "in Support of Complaint." (Doc. No. 5.) Based on Plaintiff's representation, the Court will treat these documents as if they were attached to Plaintiffs' Complaint. *See, e.g., Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir.2000) ("When considering a motion to dismiss ... the court limits its consideration

to the pleadings and exhibits attached thereto.") (quotation omitted). The Court will also consider in this Order the transcript of the November 19, 2008 hearing provided by the United States (Doc. No. 12–2) because Plaintiffs concede the transcript is accurate and reflect the exchange at the hearing (Doc. No. 15, p. 5).

on October 27, 2010. (*Id.*, ¶¶ 17–19.) The United States denied all of Plaintiffs' EAD applications. because their asylum clock was stopped at 135 days by the Immigration Court at the November 19, 2008 hearing. (See Doc. Nos. 5–1, 5–2, 5–3, and 5–4.) Plaintiffs ask this Court to review these denials.

## JURISDICTION

As an initial matter, this Court must consider the jurisdictional basis for Plaintiffs' claims. Plaintiffs assert that this Court has jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1361 (Mandamus Act), 5 U.S.C. § 702 et seq. (Administrative Procedure Act), and 28 U.S.C. §§ 2201, 2202 (Declaratory Judgment Act). Of these, only the Mandamus Act or the Administrative Procedure Act working in conjunction with 28 U.S.C. § 1331 provide a possible jurisdictional bases for Plaintiffs' claims. *See, e.g., Jones v. Alexander,* 609 F.2d 778, 781 (5th Cir.1980) ("The Declaratory Judgment Act is not an independent ground for jurisdiction; it permits the ward of declaratory relief only when other bases for jurisdiction are present.").

■ The Court concludes that it does not have mandamus jurisdiction. To invoke mandamus jurisdiction, "(1) the plaintiff must have a clear right to the relief, (2) the defendant must have a clear duty to act, and (3) no other adequate remedy must be available." *Jones,* 609 F.2d at 781. Here, as discussed in more detail below, the Court finds that the United States does not have a clear, non-discretionary duty to approve Plaintiffs' EAD applications (if it has one at all), until 180 days have passed from the time of filing of Plaintiffs' asylum application, not including any delays attributed to Plaintiffs. Thus, mandamus jurisdiction will not lie.

■ The Court concludes it may review the decision denying Plaintiffs' EAD applications, if at all, pursuant to the judicial review mechanism of the Administrative Procedure Act ("APA").[3] *See* 5 U.S.C. § 702 et seq. Title 28 U.S.C. § 1331, which generally grants this Court jurisdiction to hear cases involving federal questions, "confer[s] jurisdiction on federal courts to review agency action." *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint if it fails to state a claim upon which relief can be granted. Thus, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint.

In considering a motion to dismiss brought under Rule 12(b)(6), the alleged facts in the complaint must be accepted as true and be construed in the light most favorable to the plaintiffs. *Castro v. Sec'y of Homeland Sec.,* 472 F.3d 1334, 1336 (11th Cir.2006) (quoting *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir.2003)). Dismissal is warranted if, assuming the truth of

---

**3.** As discussed by the Eleventh Circuit in *Hamby v. Janer,* 808 F.2d 1433 (11th Cir. 1987), judicial review under Section 702 of the APA is precluded if another statute expressly or impliedly forbids the relief requested. After careful review of the Immigration and Nationality Act ("INA") as well as other portions of the U.S.Code, the Court has found no statute precluding review of denials of an EAD application made by an asylum applicant. The parties have disclosed none. Indeed, the United States asserted in is motion that the only proper jurisdictional basis for this suit is by way of the APA in conjunction with the statute conferring federal questions jurisdiction. Based upon this representation, the Court will review the decision under the APA's judicial review provisions.

the factual allegations of the plaintiff's complaint, there is a dispositive legal issue which precludes relief. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

■ In absence of a statutorily defined standard of judicial review of the agency action, the APA supplies the applicable standard. 5 U.S.C. § 701(a); *see also United States v. Bean*, 537 U.S. 71, 77, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002). Under the APA, this Court's review of an agency's decision is "usually limited to determining whether agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Bean*, 537 U.S. at 77, 123 S.Ct. 584 (quoting 5 U.S.C. § 706(2)(A)). Judicial review under the APA is "highly deferential, with a presumption In favor of finding the agency action valid." *Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir.2009). This Court may not "substitute its own judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The Court's review is limited also to the administrative record. *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335–36 (4th Cir.1995). If the record reveals a rational basis for the decision, then the agency action must stand. *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 498 (D.C.Cir.1988).

## ANALYSIS

■ After reviewing the portions of the agency record attached to Plaintiffs' Complaint as well as the transcript of the November 19, 2008 master calendar hearing, the Court finds that the United States did not act in an arbitrary or capricious manner in denying Plaintiffs' EAD applications. Plaintiffs challenge the actions of the Immigration Court when it stopped Plaintiffs' asylum clock at the November 19, 2008 master calen-

dar hearing. They theorize that the dates offered by the Immigration Court for an "early" hearing on the merits of their removal proceedings were merely a pretext for the purpose of stopping Plaintiffs' asylum clock. If permitted to proceed with this action, Plaintiffs believe they can obtain records showing that the dates offered by the Immigration Court were not actually "available." Plaintiffs argue further that USCIS cannot rely on the Immigration Court's asylum clock when USCIS adjudicates an alien's EAD application.

The Court does not find these arguments compelling. First, Plaintiffs intended discovery is of no moment in the context of an APA review. The Court must limit its review of the agency's decision to what is in the administrative record. *Fort Sumter Tours, Inc.*, 66 F.3d at 1335–36. Further, the requested discovery would not necessarily show the dates offered were not available and, therefore, pretextual. The Immigration Court may have had cases scheduled for those dates prior to offering them to Plaintiffs by using, for example, a "cattle call" procedure, or the Immigration Court may choose to reschedule previously scheduled hearings when faced with the need to handle an "expedited" asylum application.

Second, it is not only rational but also realistic and efficient for USCIS to rely on the records of the Immigration Court when calculating how many days have run on an applicant's asylum clock. The processing of asylum applications and EAD applications are closely linked, if not inextricably intertwined. The asylum process, which must be completed within a set time, involves both USCIS and the Immigration Court. Both agencies must work together to process these applications.

Someone must keep track of the time that has passed since the asylum applica-

tion was filed, but both entities surely need not keep separate asylum clocks. The system the United States has in place permits the agency tasked with a particular stage of the asylum application process to create a record of events which occur during that particular stage. Using these records, the system calculates the time that has passed since the filing of the application. This system is efficient; it prevents the duplication of work; and it decreases the risk of inconsistent calculations.

It also is rational for the Immigration Court to control the clock once an asylum application is referred to it for adjudication. The Immigration Court handles the "heavy lifting" in adjudicating the asylum applications, is experienced in calendaring and scheduling, and has Immigration Judges readily available to address an applicant's objections to the tolling of their asylum clock *at the time it is stopped.*

In this case, Plaintiffs' asylum clock calculation was stopped by the Immigration Court on November 19, 2008. Plaintiffs, who were represented by counsel at the hearing, did not object to the Immigration Court's decision to stop the clock. As a result, the hands of the clock froze at 135 days. USCIS reasonably relied on the Immigration Court's records when it subsequently adjudicated Plaintiffs' EAD application. Further, pursuant to 8 C.F.R. § 208.7(a), Plaintiffs were prohibited from submitting an EAD application, and US-CIS was prohibited from approving any such application.[4]

Put simply, there was a rational basis for the decision of the United States to deny Plaintiffs' EAD applications, and US-CIS did not act in an arbitrary or capricious manner.

## CONCLUSION

Accordingly, Defendant's Motion to Dismiss (Doc. No. 12) is **GRANTED**. This case is dismissed with prejudice.[5] The Clerk of Court is directed to close the file.

---

4. Thus, the United States could not have a clear, non-discretionary duty to approve Plaintiffs' EAD applications. Furthermore, it is unclear whether the United States could approve Plaintiffs' EAD applications now that Plaintiff's asylum application has been denied.

5. The records submitted by the parties, i.e., the attachments to the Complaint and Defen-

dant's Motion to Dismiss, appear to contain substantially all of the administrative record relating to the challenged administrative decision. Upon review of this record, it does not appear Plaintiffs would be able to amend their Complaint to state a claim upon which relief may be granted. As such, the dismissal is with prejudice.